**THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**TYLER DIVISION**

| | | |
|---|---|---|
| BLUE CALYPSO, INC., | § | |
| | § | |
| v. | § | No. 6:12cv486 |
| | § | (LEAD CASE) |
| GROUPON, INC. | § | |
| _____ | § | |
| | § | |
| | § | |
| IZEA, INC. | § | No. 6:12cv786 |
| | § | |
| _____ | § | |
| | § | |
| | § | |
| YELP, INC. | § | No. 6:12cv788 |
| | § | |
| _____ | § | |
| | § | |
| | § | |
| FOURSQUARE LABS, INC. | § | No. 6:12cv837 |
| | § | |
| | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Before the Court are Plaintiffs Blue Calypso, Inc. and Blue Calypso LLC's (collectively,

"Plaintiff's") Opening Claim Construction Brief (Dkt. No. 163), Defendants Groupon Inc.,

IZEA, Inc., Foursquare Labs, Inc., and Yelp Inc.'s (collectively, "Defendants'") Responsive

Claim Construction Brief (Dkt. No. 171), and Plaintiff's Reply Claim Construction Brief (Dkt.

No. 175).[1]  Further before the Court are Defendants' Supplemental Claim Construction Brief

(Dkt. No. 253) and Plaintiff's Supplemental Responsive Claim Construction Brief (Dkt.

No. 264).

On July 8, 2015, the Court held a claim construction hearing and heard argument.

---

[1] Docket numbers herein refer to Civil Action No. 6:12cv486 unless otherwise indicated.

**Table of Contents**

I.  BACKGROUND ............................................................................................................. 3

II.  LEGAL PRINCIPLES .................................................................................................. 4

III.  CONSTRUCTION OF AGREED TERMS .................................................................. 8

IV.  CONSTRUCTION OF DISPUTED TERMS ............................................................... 9

   A.  "endorsement tag" ............................................................................................... 9

   B.  "qualified subscriber" ....................................................................................... 13

   C.  "endorsement opportunity" and "endorsement opportunities" ......................... 18

   D.  Preambles ........................................................................................................... 20

   E.  "subsidy" and "subsidizing" .............................................................................. 24

   F.  "subsidy program" ............................................................................................. 28

   G.  "testimonial tag" ................................................................................................ 30

   H.  "set" .................................................................................................................... 32

   I.  "content communication that can be sent from the qualified subscriber to the recipient" and "content communication between the first source communications device and the first destination communication device" ..................................................... 37

   J.  "conditioning . . . based on" ............................................................................... 41

V.  CONCLUSION ............................................................................................................ 44

# I. BACKGROUND

Plaintiff brings suit alleging infringement of United States Patents No. 8,155,679 ("the '679 Patent"), 8,438,055 ("the '055 Patent"), and 8,452,646 ("the '646 Patent") (collectively, "the patents-in-suit"). In January 2014, after the parties filed the above-cited initial claim construction briefs,[2] the Court granted a Joint Motion to Stay Litigation Pending Covered Business Method Patent Review (Dkt. No. 188). (*See* Dkt. No. 190, 1/16/2014 Order.) In April 2015, the Court lifted the stay and, after further proceedings, ordered supplemental claim construction briefing. (*See* Dkt. No 213, 4/2/2015 Order; *see also* Dkt. No. 215, 4/6/2015 Order; Dkt. No. 229, 5/4/2015 Order.) The parties then filed the above-cited supplemental claim construction briefs.

The '679 Patent, titled "System and Method for Peer-to[-]Peer Advertising Between Mobile Communication Devices," issued on April 10, 2012, and bears a filing date of November 18, 2009. The Abstract of the '679 Patent states:

> Disclosed are a method and system for peer-to-peer advertising between mobile communication devices. A subsidy program is set up based on a profile of an advertiser having at least one advertising media. A qualified subscriber is identified for the advertiser based on a profile of a subscriber. One or more advertisers and subsidy programs for the qualified subscriber is selected. In addition, when a communication transmission is received from a source communication device, at least one advertising media is associated with the communication transmission and the communication transmission is transmitted from a source communication device to a destination communication device.

The '055 Patent claims priority to, and incorporates by reference, the application that issued as the '679 Patent. The '646 Patent, in turn, claims priority to, and incorporates by reference, both the application that issued as the '679 Patent and the application that issued as the

---

[2] The initial claim construction briefs also addressed United States Patents No. 7,664,516 and 8,457,670, which are no longer at issue in these claim construction proceedings.

'055 Patent.[3]  Although the parties have addressed various differences between the specifications, the present Memorandum Opinion and Order refers to the specification of the '679 Patent unless otherwise indicated.

## II.  LEGAL PRINCIPLES

It is understood that "[a] claim in a patent provides the metes and bounds of the right which the patent confers on the patentee to exclude others from making, using or selling the protected invention."  *Burke, Inc. v. Bruno Indep. Living Aids, Inc.*, 183 F.3d 1334, 1340 (Fed. Cir. 1999).  Claim construction is clearly an issue of law for the court to decide.  *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-71 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996).

To ascertain the meaning of claims, courts look to three primary sources: the claims, the specification, and the prosecution history.  *Markman*, 52 F.3d at 979.  The specification must contain a written description of the invention that enables one of ordinary skill in the art to make and use the invention.  *Id.*  A patent's claims must be read in view of the specification, of which they are a part.  *Id.*  For claim construction purposes, the description may act as a sort of dictionary, which explains the invention and may define terms used in the claims.  *Id.*  "One purpose for examining the specification is to determine if the patentee has limited the scope of the claims."  *Watts v. XL Sys., Inc.*, 232 F.3d 877, 882 (Fed. Cir. 2000).

Nonetheless, it is the function of the claims, not the specification, to set forth the limits of the patentee's invention.  Otherwise, there would be no need for claims.  *SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985) (en banc).  The patentee is free to be his own

---

[3] The parties appear to dispute the effective filing dates of the patents-in-suit and whether the later patents are continuations-in-part (*see, e.g.,* Dkt. No. 170, at 6-7), but any such disputes have no impact on the Court's analysis in the present Memorandum Opinion and Order.

lexicographer, but any special definition given to a word must be clearly set forth in the specification. *Intellicall, Inc. v. Phonometrics, Inc.*, 952 F.2d 1384, 1388 (Fed. Cir. 1992). Although the specification may indicate that certain embodiments are preferred, particular embodiments appearing in the specification will not be read into the claims when the claim language is broader than the embodiments. *Electro Med. Sys., S.A. v. Cooper Life Sciences, Inc.*, 34 F.3d 1048, 1054 (Fed. Cir. 1994).

This Court's claim construction analysis is substantially guided by the Federal Circuit's decision in *Phillips v. AWH Corporation*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc). In *Phillips*, the court set forth several guideposts that courts should follow when construing claims. In particular, the court reiterated that "the claims of a patent define the invention to which the patentee is entitled the right to exclude." 415 F.3d at 1312 (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). To that end, the words used in a claim are generally given their ordinary and customary meaning. *Id.* The ordinary and customary meaning of a claim term "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at 1313. This principle of patent law flows naturally from the recognition that inventors are usually persons who are skilled in the field of the invention and that patents are addressed to, and intended to be read by, others skilled in the particular art. *Id.*

Despite the importance of claim terms, *Phillips* made clear that "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.* Although the claims themselves may provide guidance as to the meaning of particular terms, those terms are part of "a fully integrated written instrument." *Id.* at 1315

(quoting *Markman*, 52 F.3d at 978). Thus, the *Phillips* court emphasized the specification as being the primary basis for construing the claims. *Id.* at 1314-17. As the Supreme Court stated long ago, "in case of doubt or ambiguity it is proper in all cases to refer back to the descriptive portions of the specification to aid in solving the doubt or in ascertaining the true intent and meaning of the language employed in the claims." *Bates v. Coe*, 98 U.S. 31, 38 (1878). In addressing the role of the specification, the *Phillips* court quoted with approval its earlier observations from *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998):

> Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim. The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.

*Phillips*, 415 F.3d at 1316. Consequently, *Phillips* emphasized the important role the specification plays in the claim construction process.

The prosecution history also continues to play an important role in claim interpretation. Like the specification, the prosecution history helps to demonstrate how the inventor and the United States Patent and Trademark Office ("PTO") understood the patent. *Id.* at 1317. Because the file history, however, "represents an ongoing negotiation between the PTO and the applicant," it may lack the clarity of the specification and thus be less useful in claim construction proceedings. *Id.* Nevertheless, the prosecution history is intrinsic evidence that is relevant to the determination of how the inventor understood the invention and whether the inventor limited the invention during prosecution by narrowing the scope of the claims. *Id.*; *see Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1350 (Fed. Cir. 2004) (noting that "a

patentee's statements during prosecution, whether relied on by the examiner or not, are relevant to claim interpretation").

*Phillips* rejected any claim construction approach that sacrificed the intrinsic record in favor of extrinsic evidence, such as dictionary definitions or expert testimony. The *en banc* court condemned the suggestion made by *Texas Digital Systems, Inc. v. Telegenix, Inc.*, 308 F.3d 1193 (Fed. Cir. 2002), that a court should discern the ordinary meaning of the claim terms (through dictionaries or otherwise) before resorting to the specification for certain limited purposes. *Phillips*, 415 F.3d at 1319-24. According to *Phillips*, reliance on dictionary definitions at the expense of the specification had the effect of "focus[ing] the inquiry on the abstract meaning of words rather than on the meaning of claim terms within the context of the patent." *Id.* at 1321. *Phillips* emphasized that the patent system is based on the proposition that the claims cover only the invented subject matter. *Id.*

*Phillips* does not preclude all uses of dictionaries in claim construction proceedings. Instead, the court assigned dictionaries a role subordinate to the intrinsic record. In doing so, the court emphasized that claim construction issues are not resolved by any magic formula. The court did not impose any particular sequence of steps for a court to follow when it considers disputed claim language. *Id.* at 1323-25. Rather, *Phillips* held that a court must attach the appropriate weight to the intrinsic sources offered in support of a proposed claim construction, bearing in mind the general rule that the claims measure the scope of the patent grant.

In general, prior claim construction proceedings involving the same patents-in-suit are "entitled to reasoned deference under the broad principals of *stare decisis* and the goals articulated by the Supreme Court in *Markman*, even though *stare decisis* may not be applicable *per se*." *Maurice Mitchell Innovations, LP v. Intel Corp.*, No. 2:04-CV-450, 2006 WL 1751779,

at *4 (E.D. Tex. June 21, 2006) (Davis, J.); *see TQP Development, LLC v. Inuit Inc.*, No. 2:12-CV-180, 2014 WL 2810016, at *6 (E.D. Tex. June 20, 2014) (Bryson, J.) ("[P]revious claim constructions in cases involving the same patent are entitled to substantial weight, and the Court has determined that it will not depart from those constructions absent a strong reason for doing so."); *see also Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 839-40 (2015) ("prior cases will sometimes be binding because of issue preclusion and sometimes will serve as persuasive authority") (citation omitted).

The Court nonetheless conducts an independent evaluation during claim construction proceedings. *See, e.g., Texas Instruments, Inc. v. Linear Techs. Corp.*, 182 F. Supp. 2d 580, 589-90 (E.D. Tex. 2002); *Burns, Morris & Stewart Ltd. P'ship v. Masonite Int'l Corp.*, 401 F. Supp. 2d 692, 697 (E.D. Tex. 2005); *Negotiated Data Solutions, Inc. v. Apple, Inc.*, No. 2:11-CV-390, 2012 WL 6494240, at *5 (E.D. Tex. Dec. 13, 2012).

## III. CONSTRUCTION OF AGREED TERMS

The Court hereby adopts the following agreed-upon constructions:

| Term | Claims | Agreed Construction |
|------|--------|---------------------|
| "demographic" | '679 Patent: Claim 1<br><br>'055 Patent: Claims 2 and 12 | "related to education, employment, purchasing habits, interests, hobbies, affiliations, age, gender, geographic location, or other data used to identify a target market for a product or service" |
| "incentive program" | '055 Patent: Claims 2 and 12<br><br>'646 Patent: Claim 4 | "a set of rules governing an incentive distribution" |

| "incentivizing" | '055 Patent:<br>Claim 1<br><br>'646 Patent:<br>Claims 1 and 2 | "offering a reward provided to a subscriber based on an endorsement" |
|---|---|---|
| "intermediary" | '055 Patent:<br>Claims 2 and 12<br><br>'646 Patent:<br>Claims 4 and 6-8 | "one or more computer servers and memory executing computer applications and communications to implement the advertising endorsement system" |
| "offer" | '646 Patent:<br>Claims 4, 6, and 8 | "an actionable display on a subscriber communication device or a destination communication device that when validated provides a benefit" |
| "qualified subscriber"<br><br>('055 and '646 Patents only) | '055 Patent:<br>Claims 2 and 12<br><br>'646 Patent:<br>Claim 4 | "a person who meets the demographic criteria of an advertiser" |
| "testimonial" | '055 Patent:<br>Claims 2, 3 and 12-13 | "a text message, picture, audio or video message associated with an advertiser, advertisement or advertising program" |

(Dkt. No. 151, 10/4/2013 Joint Claim Construction and Prehearing Statement, at 2; Dkt. No. 163 at 27; Dkt. No. 171, at 5; Dkt. No. 244, 5/15/2015 Joint Claim Construction and Prehearing Statement, at 2.).

## IV. CONSTRUCTION OF DISPUTED TERMS

### A. "endorsement tag"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "an active link including a unique identifier" | "an active link including a unique identifier to allow viewing and tracking of advertisements, source communication devices and event identifications" |

(Dkt. No. 253, at 2.)  The parties submit that this term appears in Claims 1 and 6 of the '679

Patent, Claims 2 and 12 of the '055 Patent, and Claim 4 of the '646 Patent.  (Dkt. No. 244,

Ex. A, at 2.)

<u>(1)  The Parties' Positions</u>

Plaintiff has argued:

> The specification of the '055 patent, when considered as a whole, describes the
> endorsement tag consistent with the other patents-in-suit as "a serialized URL link
> that when activated causes an advertisement to be sent from a third party
> intermediary to the destination communication device over the network."
> '055 patent, col. 1:56-65.  The extra limitations sought by the Defendants—
> regarding using the unique identifier for tracking or viewing advertisements,
> source communication devices, and event identification—appear in dependent
> claims, such as dependent claim 4 of the '055 patent (describing a first, second,
> and third identifier components of the endorsement tag and their uses).

(Dkt. No. 163, at 16.).

Defendants have responded that "[t]he term appears in the 'Definitions' section of the

'055 Patent, and is defined as 'an active link including a unique identifier to allow viewing of

advertisements and track [*sic*] an advertisement, source communication device and event

identification.'"  (Dkt. No. 171, at 4 (quoting '055 Patent at 3:11-14).)  Defendants have also

argued that "[n]othing in Claim 4 of the '055 Patent is rendered superfluous by the patentee's

definition" because "[t]he patentee's definition, urged by Defendants, does not specify the

method by which an 'endorsement tag' is created."  (Dkt. No. 171, at 4.)

Plaintiff has replied that "[t]he patent specifications are replete with the term

'endorsement[,]' [a]nd 'tag' is a term that is readily used by persons of ordinary skill in the art to

refer to an active link with a unique identifier . . . ."  (Dkt. No. 175, at 5.)  Plaintiff has further

argued that Defendants' proposed construction would exclude an embodiment, disclosed in all of

the patents-in-suit, in which "the recipient receives an active link with a unique identifier (in this

example, a hyperlink)—not one that, as Defendants propose, *necessarily* allow[s] viewing *and* tracking of advertisements *and* source communication devices *and* event identification *in all instances*." (*Id.*, at 6; *see* '679 Patent at 5:32-44.) Finally, Plaintiff has replied that the definition of "endorsement tag" in the '055 Patent is consistent with Plaintiff's proposed construction because "the remainder of the definition merely states the intended or beneficial purpose for the link, which may or may not appear in the dependent claims." (*Id.*, at 7.)

In supplemental briefing, Defendants reiterate that the '055 Patent and the '646 Patent expressly define the disputed term. (Dkt. No. 253, at 2-3.) Defendants submit that "[t]his definition is reinforced by FIG. 9 of the '055 Patent (FIG. 8 of the '646 Patent), which describes 'a method for the creation of a unique identifier' that includes the incorporation of information related to the 'Source Communication Device,' 'Advertising Campaign Identification' and 'Impression Identification' into the 'Endorsement Tag.'" (Dkt. No. 253, at 3.)

Plaintiff responds that its proposed construction avoids jury confusion "by removing the remainder clause that defines only *potential*, but not *necessary*, ways the active link could be used." (Dkt. No. 264, at 1.) Plaintiff also argues that Defendants' proposal "read[s] out a preferred embodiment in the parent '679 patent." (*Id.*, at 2.) "Alternatively," Plaintiff submits, "the Court could avoid the potential for jury confusion by construing this term for the '055 and '646 patents to mean: "an active link including a unique identifier to allow viewing *or* tracking of advertisements, source communication devices *or* event identifications." (*Id.*, at 1 n.1.)

(2) Analysis

Claim 1 of the '679 Patent is representative and recites, in relevant part (emphasis added):

> 1. In a system comprising a network, a source communication device, a destination communication device and an intermediary connected to the network,

said intermediary comprising a server adapted to execute a method for providing advertising content from at least one advertiser of a group of advertisers to a recipient associated with the destination communication device and for subsidizing a qualified subscriber associated with the source communication device comprising:

. . .

providing an *endorsement tag* related to the at least one advertiser of the group of advertisers and linked with the advertising content;

transmitting to the qualified subscriber information for creating a content communication that can be sent from the qualified subscriber to the recipient, the content communication including the *endorsement tag*;

. . .

receiving a signal through execution of the *endorsement tag* to transmit the advertising content; and,

transmitting the advertising content to the recipient.

The specification of the '679 Patent discloses:

FIG. 7b describes a communication and the recording of historical data. Subscriber 600 initiates a communication with contact 760 in step 790. At steps 792 and 794, the endorsement manager software inserts and sends an endorsement and *embedded link* in the communication. The destination device accepts the communication and *embedded link* and sends a response to the source device in steps 796 and 798. The source device records the historical data in step 797.

FIG. 7c describes the data flow required for subsidy collection. At step 750, the intermediary receives history data from the subscriber 600 reflecting a communication with contact 760, such as a phone can [*sic*, call] where *an imbedded* [*sic*, embedded] *link has been sent in an endorsement message*. At step 762, contact 760 follows the *link embedded in the endorsement* to the advertisement data hosted by intermediary 640. Intermediary 640 monitors historical data including the number of endorsements sent by subscriber 600 and the number of recipients contacted by subscriber 600 that use the embedded link to view the advertisement from the set of advertisements 664. Individual contacts are identified by a unique identifier embedded in each endorsement sent by subscriber 600 to contact 760. At step 766, the unique identifier is decoded by the intermediary site 640, allowing identification of the contact 760 responding to the endorsement. At step 751, the intermediary calculates the subsidy and analyzes the subscriber history data and contact interaction history.

'679 Patent at 9:37-60 (emphasis added).

The '055 Patent and the '646 Patent, in a "Definitions" section, expressly refer to an

"endorsement tag" as "an active link including a unique identifier to allow viewing and tracking

of advertisements, source communication devices and event identifications." '646 Patent at 3:20-22; *see* '055 Patent at 3:10-13. The specification thus sets forth the language proposed by Defendants. *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) ("The specification acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication."). Further, in general, when "patents all derive from the same parent application and share many common terms, we must interpret the claims consistently across all asserted patents." *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1293 (Fed. Cir. 2005); *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1334 (Fed. Cir. 2003) ("[W]e presume, unless otherwise compelled, that the same claim term in the same patent or related patents carries the same construed meaning.").

On balance, however, "to allow viewing and tracking of advertisements, source communication devices and event identifications" is language describing intended beneficial uses or purposes rather than defining the disputed term itself. *See Howmedica Osteonics Corp. v. Wright Med. Tech., Inc.*, 540 F.3d 1337, 1345 (Fed. Cir. 2008) ("The court's task is not to limit claim language to exclude particular devices because they do not serve a perceived 'purpose' of the invention.") (quoting *E-Pass Techs., Inc. v. 3Com Corp.*, 343 F.3d 1364, 1370 (Fed. Cir. 2003)).

The Court accordingly hereby construes **"endorsement tag"** to mean **"an active link including a unique identifier."**

**B. "qualified subscriber"**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning | "a person who meets the demographic criteria of an advertiser" |

(Dkt. No. 253, at 3.)  The parties submit that this term appears in Claims 1, 3, and 6 of the '679 Patent.  (Dkt. No. 244, Ex. A, at 2.)

<u>(1)  The Parties' Positions</u>

Defendants have argued that "qualified subscriber" is a "coined term" that is explicitly defined by the patents-in-suit in a "Definitions" section.  (Dkt. No. 171, at 20.)  Plaintiff has replied that "Defendants offer no reason why this term must be construed for all patents based upon a definition in the '055 Patent . . . ."  (Dkt. No. 175, at 14.)  Plaintiff has also argued that "Defendants' proposal excludes embodiments in which qualification depends upon capabilities of the subscriber's device."  (*Id.*, at 15.)

In supplemental briefing, Defendants reiterate that the '055 Patent expressly defines the disputed term, and Defendants submit that "[t]he parties do not dispute that the claim term 'qualified subscriber' has the same definition in both the '679 and '055 Patents."  (Dkt. No. 253, at 3.)  Further, Defendants argue, "just because the specification discloses an embodiment with additional criteria, which may also factor into the qualification of a subscriber, does not defeat the clear import of the claim language, which conditions subscriber qualification on the existence of a 'match condition' derived between advertiser and subscriber 'profiles'—profiles which explicitly include 'demographic data.'"  (*Id.*, at 4 (citing '679 Patent at Claim 1).)

Plaintiff responds by reiterating that "Defendants offer no reason why this term must be construed for the '679 patent based upon a definition in the later-filed '055 patent."  (Dkt. No. 264, at 3.)

<u>(2)  Analysis</u>

The specifications of the '055 Patent and the '646 Patent refer to the disputed term in a "Definitions" section: "'Qualified Subscriber': a person who meets the demographic criteria of

an advertiser." '055 Patent at 3:27-28; '646 Patent at 3:37-38. As noted above, the parties now

agree that as to the '055 Patent and the '646 Patent, the term "qualified subscriber" should be

construed as "a person who meets the demographic criteria of an advertiser." (Dkt. No. 244,

5/15/2015 Joint Claim Construction and Prehearing Statement, at 2.)

The '679 Patent contains no such express definition and, as Plaintiff notes, the

specification refers to communication habits as well as to capabilities of the subscriber's device:

> Once the subscriber's profile is set up, in step 38, the intermediary 9 analyzes the
> profile data and identifies advertisers 10 whose criteria for subsidy match the
> subscriber's criteria. For example, advertiser A offers static graphic media and
> video media and advertiser B offers only audio media. Based on the media type
> offered, the intermediary 9 *qualifies those subscribers whose communication
> devices have the capability to accept static graphics, video, and/or audio*. The
> intermediary 9 may also require the subscriber 1 to qualify for subsidy over a trial
> period of time in order to quantify and qualify the *calling habits* of subscriber 1.
> For example, the intermediary 9 may examine the usage history of subscribers
> and *qualify only those subscribers who are communicating with others most
> frequently*.

'679 Patent at 4:38-51 (emphasis added). Additionally, the specification of the '679 Patent refers

to subscriber qualification based not only on demographic criteria but also on financial status:

> FIG. 7a describes the bi-directional endorsement process between the subscriber
> and the advertiser via the intermediary during the enrollment process. * * *
>
> At step 700, subscriber 600 contacts intermediary 640 through network 650 using
> source devices 602 and makes a subscription request including a request for
> endorsement. At this step, subscriber 600 selects one or more potential endorsers
> from [a] list of endorsement companies 644. Subscriber 600 submits application
> 604, including the selected endorsement companies and *subscriber demographic
> data*, to intermediary 640. At step 701, an advertiser contacts intermediary 640.
> Advertiser 660 submits one or more sets of *desired demographic criteria* to
> intermediary 640.
>
> At step 702, intermediary 640 *correlates the subscriber data with the set of
> demographic data criteria of the advertiser*. A correlation value is assigned by
> intermediary 640.

In the preferred embodiment, the correlation value is calculated as a match value or weighted percentage between the *demographic criteria 646 and the subscriber demographic data*.

Other correlation routines can be used to provide additional metrics to the subscriber and the advertiser related to the *"match" of the subscriber demographic data with the advertiser criteria*. * * *

In another embodiment, *credit reports* of the subscriber from third parties may be implemented to calculate a correlation value. Additionally, *financial information* related to the subscriber, such as *credit history or financial status* may be evaluated to arrive at a correlation value. At step 706, potential subscribers who score lower than the required correlation value are recommended for rejection.

Alternatively at step 702, advertiser 660 receives a set of subscriber data from intermediary 640. Advertiser 660 then correlates subscriber specific data 606 with *desired audience demographic data 668* to derive a correlation value.

* * *

*If a sufficient correlation value is achieved or the subscriber purchases an endorsement, the subscriber is deemed a "qualified" subscriber.* At step 710, the advertiser notifies intermediary 640 of the endorsement and subsidy opportunities for which the subscriber has been qualified. Intermediary 640 then notifies subscriber 600, at step 712.

* * *

The bi-directional selection process allows the subscriber to select endorsers that appeal to him. The advertiser then *determines if the subscriber is qualified based on a correlation between the subscriber's demographics and those desired by the advertiser*. The subscriber's contacts presumably share some, if not all, of the subscriber's demographics and interests. Therefore, the contacts provide a select market and value to the advertiser, while requiring only a single demographic comparison. This allows an advertiser to focus its endorsements on favorable target markets without having to qualify each possible customer or examine demographics of a large number of potentially bad prospects.

'679 Patent at 7:56-9:34 (emphasis added).

On balance, the above-quoted disclosures in the '679 Patent demonstrate that in the absence of an explicit definition of "qualified subscriber," that term is broader than "demographics," even in light of the parties' above-noted agreed-upon construction of

"demographic" as meaning "related to education, employment, purchasing habits, interests, hobbies, affiliations, age, gender, geographic location, or other data used to identify a target market for a product or service." (Dkt. No. 244, 5/15/2015 Joint Claim Construction and Prehearing Statement, at 2.) For example, as quoted above, qualification of subscribers can relate to device capabilities, financial information, or purchasing of endorsements.

Thus, because Defendants' proposal would limit the disputed term to particular embodiments disclosed in the specifications, Defendants' proposal of "demographic criteria" is hereby expressly rejected as to the '679 Patent. *See Innova/Pure Water*, 381 F.3d at 1117 ("[P]articular embodiments appearing in the written description will not be used to limit claim language that has broader effect."); *see also Phillips*, 415 F.3d at 1323 ("[A]lthough the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments."). Such a reading is also reinforced by surrounding claim language that expressly recites demographics where required. *See* '679 Patent at Cl. 1 (reciting "a set of demographic requirements related to at least one advertiser" and "a set of demographic data related to a subscriber).

Some construction is nonetheless warranted as to the '679 Patent so as to minimize confusion. *See TQP Dev., LLC v. Merrill Lynch & Co., Inc.*, No. 2:08-CV-471, 2012 WL 1940849, at *2 (E.D. Tex. May 29, 2012) (Bryson, J.) ("The Court believes that some construction of the disputed claim language will assist the jury to understand the claims.").

The Court therefore hereby construes **"qualified subscriber"** in the '679 Patent to mean **"a person who meets the criteria of an advertiser."**

## C. "endorsement opportunity" and "endorsement opportunities"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning | "an opportunity to participate in an incentive program, including a description of the advertiser, advertising campaign, advertisement and incentive program, including incentive values offered" |

(Dkt. No. 253, at 4.)  The parties submit that these terms appear in Claims 2 and 12 of the '055 Patent.  (Dkt. No. 244, Ex. A, at 2.)

(1)  The Parties' Positions

Defendants have argued that "construction is required to provide a definite form to this concept and distinguish it from the term 'offer' discussed above."  (Dkt. No. 171, at 28.) Plaintiff has replied that "[a]n endorsement opportunity is just an opportunity to endorse," and Plaintiff has argued that the patentee did not redefine the term.  (Dkt. No. 175, at 15.)

In supplemental briefing, Defendants argue that "Plaintiffs' proposed plain and ordinary meaning construction attempts to broaden this term beyond its express definition in the '055 Patent."  (Dkt. No. 253, at 4.)  Defendants urge that "[e]very reference to an 'endorsement opportunity' appearing in the '055 Patent is consistent with that term's express definition," and "[t]hat express definition is the only guidance provided in the patent for construing the disputed claim term."  (*Id.*, at 5.)  Further, Defendants note, the specification expressly defines related terms such as "endorsement," "endorsement tag," "endorsement identifier," and "endorser." (*Id.*)

Plaintiff responds that Defendants' proposed construction "improperly reads in characteristics of a singular embodiment in the specification."  (Dkt. No. 264, at 3.)  Plaintiff

argues that "[t]here is no specific catalog of things the information must contain other than an opportunity to endorse an advertiser or advertisement." (*Id.*, at 4.)

(2) Analysis

The specification of the '055 Patent discloses:

> At step 162 [in Figure 5A], the intermediary returns a list of *endorsement opportunities* for which the subscriber is "qualified." Each *endorsement opportunity* includes a description of the advertiser, advertising campaign, advertisement and incentive program including incentive values offered.

'055 Patent at 10:1-5. The specification of the '055 Patent also includes a "Definitions" section that defines "endorsement" as "an event of sending an endorsement tag to a recipient." *Id.* at 3:8-9.

On balance, particularly in light of this express definition of the constituent term "endorsement," the disputed terms require no further construction. The above-quoted disclosure regarding "[e]ach endorsement opportunity" pertains to features of particular embodiments that should not be imported into the claims. *See Innova/Pure Water*, 381 F.3d at 1117 ("[P]articular embodiments appearing in the written description will not be used to limit claim language that has broader effect."); *see also Phillips*, 415 F.3d at 1323 ("[A]lthough the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments."). Defendants' proposal of a list of specific features is therefore hereby expressly rejected.

The Court accordingly hereby construes **"endorsement opportunity"** and **"endorsement opportunities"** to have their **plain meaning**.

### D.  Preambles

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Preambles are not limiting in the manner Defendants propose. | Preambles are limiting:<br>    "subsidizing qualified subscriber with source communication device associated with providing advertising content to recipient with destination communication device" ('679 Patent)<br>    "incentivizing subscriber associated with source communication device associated with providing advertising content to a first recipient with first destination communication device" ('055 & '646 Patents) |

(Dkt. No. 253, at 6.)  The parties submit that the disputed preambles are in Claim 1 of the '679 Patent, Claims 2 and 12 of the '055 Patent, and Claim 4 of the '646 Patent.  (Dkt. No. 244, Ex. A, at 1.)

<u>(1)  The Parties' Positions</u>

Defendants argue that "[a]s captured in the preamble and specification of the asserted patents, the alleged invention relates fundamentally to the concept of subsidizing or incentivizing a person who receives a targeted advertisement to share or refer that advertisement with another."  (Dkt. No. 253, at 6; *see id.* at 6-7.)  Defendants submit that in Covered Business Method Patent Review ("CBM") proceedings, Plaintiff asserted, and the PTO's Patent Trial and Appeals Board ("PTAB") found, that certain preambles are limiting.  (*Id.*, at 7.)  Defendants conclude: "Plaintiffs are trying to have it both ways.  Plaintiffs need the preambles to be limiting to avoid having invalid claims for lack of antecedent basis, but want to disclaim all other aspects of the preambles, including the core concept of the patents—the relationship between the subsidy or incentive and the act of sharing or endorsing an advertisement."  (*Id.*, at 8.)  Defendants conclude: "As not only does the preamble give life and meaning to the claim but is also

necessary to avoid the invalidity of the claims, the Court should hold that the preambles are limiting for all aspects including the association between the subsidizing or incentivizing of the subscriber and the act of providing advertisements from the subscriber to a destination device." (*Id.*)

Plaintiff responds that the preamble language referring to a "method for providing advertising content to a recipient," as well as for "subsidizing a qualified subscriber," "is only purposeful language, which is not limiting." (Dkt. No. 264, at 5.) Plaintiff also urges that "[t]he plain language of the preamble does not require that subsidizing occur in response to providing advertising content." (*Id.*, at 6.)

(2) Analysis

Claim 1 of the '679 Patent, for example, recites (emphasis added):

1. In a system comprising a network, *a source communication device*, *a destination communication device* and *an intermediary connected to the network*, *said intermediary* comprising a server adapted to execute a method for providing advertising content from at least one advertiser of *a group of advertisers* to a recipient associated with *the destination communication device* and for subsidizing a qualified subscriber associated with *the source communication device* comprising:

obtaining a first profile from the at least one advertiser in *the group of advertisers* including a set of demographic requirements related to at least one advertiser of *a group of advertisers* and storing the first profile by *the intermediary*;

obtaining a second profile from *the source communication device* including a set of demographic data related to a subscriber and storing the second profile by *the intermediary*;

deriving a match condition between the first profile and the second profile;

determining if the subscriber is a qualified subscriber based on the match condition;

conditioning a set of subsidy programs based on the match condition;

communicating a subsidy program of the set of subsidy programs to the qualified subscriber;

receiving one or more selections of the at least one advertiser of *the group of advertisers* and of the chosen subsidy program from the set of subsidy programs;

> providing an endorsement tag related to the at least one advertiser of *the group of advertisers* and linked with the advertising content;
>
> transmitting to the qualified subscriber information for creating a content communication that can be sent from the qualified subscriber to the recipient, the content communication including the endorsement tag;
>
> subsidizing the qualified subscriber according to the chosen subsidy program;
>
> receiving a signal through execution of the endorsement tag to transmit the advertising content; and,
>
> transmitting the advertising content to the recipient.

In CBM proceedings as to the '679 Patent, the PTAB found:

> After Institution, Patent Owner contends that the preambles of the challenged claims are limiting. Patent Owner contends that the preambles provide antecedent basis for limitations in the body of independent claims 7 and 23. As such, Patent Owner contends that "the preambles provide explicit structure to the relationship of certain components of the invention that give life, meaning and vitality to the claimed invention."
>
> We agree. * * *
>
> Notably, the preamble of independent claim 7 requires "a source communication device possessed by a subscriber," "a destination communication device possessed by a recipient," and "an advertisement." The body of claim 7 recites "the source communication device," "the subscriber," "the destination communication device," and "the advertisement," all of which rely on and derive antecedent basis from the preamble of claim 7. Similarly, the preamble of independent claim 23 recites "a first communication device," "a second communication device," and "a set of advertisers." The body of claim 23 recites "the first communication device," "the second communication device," and "the set of advertisers." Accordingly, we conclude that the preambles of independent claims 7 and 23 are entitled to patentable weight.

(Dkt. No. 253, Ex. A, *Groupon, Inc. v. Blue Calypso, Inc.*, Paper 51, Final Written Decision,

at 18-19 (P.T.A.B. Dec. 17, 2014) (citations omitted).)

Defendants urge that "this same conclusion, for the exact same reasons, applies to all of

the remaining asserted claims. In fact, during discussions with Plaintiffs, Plaintiffs have

conceded that the remaining preambles are limiting, and the disagreement centers solely on

whether they are limiting for the sole purpose of providing antecedent basis for numerous terms or whether the preambles are limiting for all purposes." (Dkt. No. 253, at 8.)

> In general, a preamble limits the invention if it recites essential structure or steps, or if it is "necessary to give life, meaning, and vitality" to the claim. *Pitney Bowes*[, *Inc. v. Hewlett-Packard Co.*], 182 F.3d [1298,] 1305 [(Fed. Cir. 1999)]. Conversely, a preamble is not limiting "where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention." *Rowe v. Dror*, 112 F.3d 473, 478, 42 USPQ2d 1550, 1553 (Fed. Cir. 1997).

*Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002); *see, e.g., Eaton Corp. v. Rockwell Int'l Corp.*, 323 F.3d 1332, 1339 (Fed. Cir. 2003) ("When limitations in the body of the claim rely upon and derive antecedent basis from the preamble, then the preamble may act as a necessary component of the claimed invention.").

In general, "the purpose or intended use of the invention . . . is of no significance to claim construction . . . ." *See Pitney Bowes*, 182 F.3d at 1305.

Here, however, because "the claim drafter cho[se] to use *both* the preamble and the body to define the subject matter of the claimed invention, the invention so defined, and not some other, is the one the patent protects." *Bell Commc'ns Research, Inc. v. Vitalink Commc'ns Corp.*, 55 F.3d 615, 620 (Fed. Cir. 1995). The entireties of the preambles are limiting. *See Proveris Scientific Corp. v. Innovasystems, Inc.*, 739 F.3d 1367, 1373 (Fed. Cir. 2014) ("The phrase 'the image data' clearly derives antecedent basis from the 'image data' that is *defined in greater detail in the preamble* as being 'representative of at least one sequential set of images of a spray plume.'") (emphasis added). This analysis applies to all of the claims at issue.

At the July 8, 2015 hearing, Plaintiff cited *TomTom Inc. v. Adolph*, --- F.3d ----, 2015 WL 3814937 (Fed. Cir. June 19, 2015) ("That [a] phrase in the preamble . . . provides a necessary structure for [the] claim . . . does not necessarily convert the entire preamble into a limitation,

particularly one that only states the intended use of the invention."). *TomTom* is distinguishable because here, in all of the claims at issue, the language relied upon for antecedent basis is intertwined with the entireties of the preambles such that the preambles cannot be parsed into limiting and non-limiting portions.

The Court therefore hereby construes Claim 1 of the '679 Patent, Claims 2 and 12 of the '055 Patent, and Claim 4 of the '646 Patent such that the **preambles are limiting**.

## E. "subsidy" and "subsidizing"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "[provide/providing] value or savings to another" | "financial assistance given by one to another" |

(Dkt. No. 253, at 10.) The parties submit that these terms appear in Claim 1 of the '679 Patent. (Dkt. No. 244, Ex. A, at 2.)[4]

### (1) The Parties' Positions

Plaintiff has argued that Defendants' proposal improperly excludes preferred embodiments, such as "product discounts," "rewards points," or anything else of value that serves as an incentive for the subscriber. (Dkt. No. 163, at 18; *see* '679 Patent at 3:39-48.)

Defendants have responded:

> Plaintiff attempts to improperly broaden the term Subsidy to include any type of incentive. The term Subsidy is not complex. Ordinary usage would indicate that if a subscriber's purchase is being subsidized, then someone other than the subscriber is mitigating or deferring a portion of the price the subscriber would otherwise pay. Defendants' construction is consistent with this plain and ordinary meaning as well as the use of the term in the specification. The specification makes it clear that the types of incentives that are "subsidies" are those that mitigate or defer subscriber expenses . . . .

---

[4] The parties also submitted the word "subsidize" for construction, but that term does not appear in the only claim identified by the parties, namely Claim 1 of the '679 Patent.

Plaintiff's proposed broad construction makes a Subsidy equivalent to an Incentive . . . .

(Dkt. No. 171, at 22-23.)

Plaintiff has replied that Defendants' proposed construction is too narrow because "[t]he patents broadly use the word 'subsidy' to include things such as levels of discounts, credits, points, offerings, and other types of subsidies or incentives . . . ." (Dkt. No. 175, at 8 (citation and internal quotation marks omitted).)

In supplemental briefing, Defendants submit that "Plaintiffs advance essentially the same construction of the term 'subsidy' that was already rejected by the PTAB." (Dkt. No. 253, at 8.)

Plaintiff responds that "[t]he problem with Defendants' proposal is that their construction will confuse the jury into thinking that a subsidy must involve the exchange of money. The PTAB did not agree with that thinking when it issued its construction for 'subsidy.'" (Dkt. No. 264, at 6.) Plaintiff notes that "the PTAB expressly stated that reward points were financial in nature because they were 'a form of currency.'" (*Id.*, at 7 (citing Dkt. No. 253, Ex. A, *Groupon, Inc. v. Blue Calypso, Inc.*, Paper 51, Final Written Decision, at 7 (P.T.A.B. Dec. 17, 2014)).)

(2) Analysis

The PTAB found:

The '679 patent does not set forth a special definition for "subsidy." Accordingly, we look to the ordinary meaning of the term "subsidy"— financial assistance given by one to another. The '679 patent's use of "subsidy" is consistent with its ordinary meaning. Specifically, the '679 patent describes an advertiser setting up a subsidy program to subsidize communication fees, offer product discounts, generate and accumulate "reward points" for subscribers, or mitigate or defer other expenses of the subscriber. ['679 Patent], col. 3, ll. 39-45 (referring to Fig. 2). These examples are financial in nature. Product discounts reduce the monetary cost of a financial transaction, reward points are a form of currency, and mitigating or deferring expenses reduces the monetary cost of a financial transaction or postpones the monetary cost of a financial transaction, respectively.

Also, the '679 [Patent] describes, as part of a subscriber setup process, an intermediary presenting, to a subscriber for selection, "subsidy programs available, ['679 Patent], col. 4, ll. 59-65 (referring to Fig. 3); *see id.* at col. 4, ll. 16-17. In an example of a bi-directional endorsement process, the '679 patent further describes an advertiser calculating the amount to subsidize the subscriber for endorsement, noting that some subscribers may receive a larger subsidy than other subscribers. ['679 Patent], col. 8, ll. 47-53 (referring to Fig. 7a); *see id.* at col. 7, l. 56.

For these reasons, in the Decision to Institute, the Board construed "subsidy" as "financial assistance given by one to another." Inst. Dec. 9-11. Neither party challenges this construction. Having considered whether the construction set forth in the Decision to Institute should be changed in light of evidence introduced during trial, we are not persuaded any modification is necessary. Therefore, we maintain the construction of "subsidy" as "financial assistance given by one to another."

(Dkt. No. 253, Ex. A, *Groupon, Inc. v. Blue Calypso, Inc.*, Paper 51, Final Written Decision, at 7-8 (P.T.A.B. Dec. 17, 2014) (footnote omitted); *id.* at 7 n.5 ("AMERICAN HERITAGE DICTIONARY 896 (3d ed. 1992) (defining "subsidy" as "1. Monetary assistance granted by a government to a person or group in support of an enterprise regarded as being in the public interest. 2. Financial assistance given by one person or government to another.")).)

Claim 1 of the '679 Patent, for example, recites (emphasis added):

1. In a system comprising a network, a source communication device, a destination communication device and an intermediary connected to the network, said intermediary comprising a server adapted to execute a method for providing advertising content from at least one advertiser of a group of advertisers to a recipient associated with the destination communication device and for *subsidizing* a qualified subscriber associated with the source communication device comprising:
    obtaining a first profile from the at least one advertiser in the group of advertisers including a set of demographic requirements related to at least one advertiser of a group of advertisers and storing the first profile by the intermediary;
    obtaining a second profile from the source communication device including a set of demographic data related to a subscriber and storing the second profile by the intermediary;
    deriving a match condition between the first profile and the second profile;
    determining if the subscriber is a qualified subscriber based on the match condition;

conditioning a set of *subsidy* programs based on the match condition;

communicating a *subsidy* program of the set of *subsidy* programs to the qualified subscriber;

receiving one or more selections of the at least one advertiser of the group of advertisers and of the chosen *subsidy* program from the set of *subsidy* programs;

providing an endorsement tag related to the at least one advertiser of the group of advertisers and linked with the advertising content;

transmitting to the qualified subscriber information for creating a content communication that can be sent from the qualified subscriber to the recipient, the content communication including the endorsement tag;

*subsidizing* the qualified subscriber according to the chosen *subsidy* program;

receiving a signal through execution of the endorsement tag to transmit the advertising content; and,

transmitting the advertising content to the recipient.

The specification of the '679 Patent discloses:

> In step 26, advertisers 10 set up a *subsidy program*. The subsidy program 13 enables advertisers 10 to select or endorse desirable subscribers in order to *subsidize the communication fees*, offer its own product *discounts* or other company's product discounts, generate and accumulate *"rewards points"* for the subscribers*, and *mitigate or defer other expenses* of the subscriber 1. The advertisers 10 may provide *other types of subsidies or incentives* to the subscribers 1 without departing [from] the spirit and scope of the present disclosure.

'679 Patent at 3:39-50 (emphasis added).

This disclosure demonstrates the broad, generic sense in which the patentee used the terms "subsidy" and "subsidizing." As discussed by the PTAB, above, the disputed term is not limited to monetary currency but rather includes, for example, "rewards points," as Plaintiff has suggested. *See id.*; *see also id.* at Claim 11 ("wherein the step of providing a subsidy program further comprises the step of relating the subsidy to one of the group of a product discount, a reward, and a mitigation of expenses"). Because the word "financial" might be read by a finder of fact as limited to monetary currency, the Court reaches a construction different from the PTAB construction that Defendants propose here.

The Court accordingly hereby construes **"subsidy"** and **"subsidizing"** to mean

**"[providing] value or savings to another."**

**F. "subsidy program"**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "a system designed to give value or savings to another" | "a system of opportunities designed to give financial assistance to another" |

(Dkt. No. 253, at 10.) The parties submit that this term appears in Claim 1 of the '679 Patent.

(Dkt. No. 244, Ex. A, at 3.)

<u>(1) The Parties' Positions</u>

Defendants have argued that their proposed construction "is designed to harmonize this term with Incentive Program, which the parties agree is 'a set of rules governing an incentive distribution.'" (Dkt. No. 171, at 24.) Plaintiff has replied that Defendants' proposed construction is "dependent upon Defendants' improper proposed definition of 'subsidy.'" (Dkt. No. 175, at 15.)

In supplemental briefing, Defendants argue that their proposed construction "mirrors the construction adopted by the PTAB during its CBM Review." (Dkt. No. 253, at 10.)

Plaintiff responds:

It is not clear what "opportunities" means within the context of the patent. The PTAB did not explain why it selectively drew that particular term from a dictionary definition when it proffered that construction in the CBM preliminary decision. But what is clear is that Defendants intend to argue that "opportunities" is necessarily plural. Nothing in the PTAB's reasoning requires that a subsidy program has multiple "opportunities."

(Dkt. No. 264, at 8.)

<u>(2) Analysis</u>

The PTAB found:

The '679 patent does not set forth a special definition for "subsidy program."  The '679 patent's use of "subsidy program" is consistent with the construction of "subsidy" to mean "financial assistance given by one to another" and the ordinary meaning of "program"—a system of services, opportunities, or projects, usually designed to meet a social need.  For example, in relation to an advertiser setting up a subsidy program, the '679 patent describes a subsidy program as enabling advertisers "to select or endorse desirable subscribers" and enabling advertisers to identify "what level of discounts, credits, points, or offerings" a subscriber would receive as a subsidy.  ['679 Patent], col. 3, ll. 39-45, 51-54.  The '679 patent also describes an intermediary presenting, to a subscriber for selection, "subsidy programs available, including the criteria for continued subsidy and levels of subsidy."  ['679 Patent], col. 4, ll. 59-65.

For these reasons, in the Decision to Institute, the Board construed "subsidy program" as "a system of opportunities designed to give financial assistance to another."  Inst. Dec. 11-13.

* * *

. . . [W]e are not persuaded any modification to the construction is necessary.  Therefore, we maintain the construction of "subsidy program" as "a system of opportunities designed to give financial assistance to another."

(Dkt. No. 253, Ex. A, *Groupon, Inc. v. Blue Calypso, Inc.*, Paper 51, Final Written Decision, at 8-11 (P.T.A.B. Dec. 17, 2014) (footnote omitted); *id.* at 9 n.6 ("AMERICAN HERITAGE DICTIONARY 1447 (3d ed. 1992) (defining 'program' as '4. A system of services, opportunities, or projects, usually designed to meet a social need')").)

The specification of the '679 Patent discloses:

In addition, the *subsidy program 13* enables advertisers 10 to identify what level of *discounts, credits, points, or offerings* the subscriber 1 receives as a subsidy *in accordance with certain performance criteria*.  An example of performance criteria includes the number of communication transmissions the subscriber had [*sic*, has] made and the length of the transmissions.

'679 Patent at 3:51-56 (emphasis added).

On balance, the PTAB's use of "financial," which Defendants proposed here, is unpersuasive for substantially the same reasons as for the other "subsidy" terms, discussed

above.  Finally, Defendants have not shown adequate support for requiring multiple

"opportunities."

The Court therefore hereby construes **"subsidy program"** to mean **"a system designed to give value or savings to another."**

**G.  "testimonial tag"**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| "active link associated with a testimonial" | Indefinite |

(Dkt. No. 253, at 11.)  The parties submit that this term appears in Claims 2 and 3 of the '055 Patent.  (Dkt. No. 244, Ex. A, at 3.)

(1)  The Parties' Positions

Defendants argue that this disputed term "is never used nor defined in the '055 Patent outside of the claims, and has no ordinary or customary meaning to one of skill in the art. Plaintiffs' construction of this term attempts to conflate 'testimonial tag' with 'endorsement tag,' a separate claim term that is defined in the specification of the '055 Patent."  (Dkt. No. 253, at 11.)

Plaintiff responds that "because 'testimonial' has already been construed, the only dispute is to [*sic*] the proper construction of 'tag.'"  (Dkt. No. 264, at 9.)

(2)  Analysis

Defendants rely upon a finding by the PTAB that the term "endorsement tag" lacks written description in related United States Patent No. 7,664,516.  (*See* Dkt. No. 253, Ex. C, *Groupon, Inc. v. Blue Calypso, Inc.*, Paper 45, Final Written Decision, at 34-38 (P.T.A.B.

Dec. 17, 2014).)[5]  Thus, what Defendants have labeled here as an indefiniteness argument

pursuant to 35 U.S.C. § 112, ¶ 2 appears to be a written description challenge pursuant to

35 U.S.C. § 112, ¶ 1.  Because claim construction proceedings generally do not address written

description challenges, Defendants' "indefiniteness" argument is hereby expressly rejected.  *See*

*Phillips*, 415 F.3d at 1327 ("[W]e have certainly not endorsed a regime in which validity analysis

is a regular component of claim construction.")

Nonetheless, Defendants' argument is premised on a matter of claim interpretation.  The

parties dispute the proper construction of "testimonial tag."  As noted above, the Court adopts

the parties' agreed-upon construction that "testimonial" means "a text message, picture, audio or

video message associated with an advertiser, advertisement or advertising program."  (Dkt. No.

151, 10/4/2013 Joint Claim Construction and Prehearing Statement, at 2; Dkt. No. 163 at 27;

Dkt. No. 171, at 5; Dkt. No. 244, 5/15/2015 Joint Claim Construction and Prehearing Statement,

at 2.).

The remaining dispute is whether a "tag" is an "active link," as Plaintiff has proposed.

The following paragraph of the specification, cited by Plaintiff as support for its presently

proposed construction, discloses as follows with reference to Figure 7:

> The endorsement manager program "associates" the testimonial with an
> advertisement by appending the endorsement tag related to a participating
> advertising campaign or advertisement to the testimonial file.  In step 314, the
> source communication device uploads the endorsement tag and the testimonial
> file to the intermediary.  At step 315, testimonial manager 109 functions are
> started and the testimonial is stored by the intermediary and associated with the
> advertising campaign or advertisement and the subscriber in the database.  In
> step 316, *an actionable link* is enabled to allow[] viewing of the associated
> testimonial within the advertisement.  At step 317, the testimonial is made
> available for viewing and editing via the website portal.

---

[5] The PTAB found unpersuasive Plaintiff's argument that the term "tag" corresponded to the
disclosure of "an executable link, such as a hyperlink."  (*See id.* at 36-37.)

'055 Patent at 13:32-44 (emphasis added).  At the July 8, 2015 hearing, Defendants countered

that Figure 7 does not illustrate creation of a testimonial tag at the source communication device,

which is recited in Claim 2 of the '055 Patent.  Regardless of whether this is so, Figure 7 and the

associated written description provide probative context as to meaning of "tag" and "testimonial

tag."

Also of note, although the parties present competing proposed constructions for the term

"endorsement tag" (addressed above), both proposals refer to "an active link including a unique

identifier."  Defendants' argument that Plaintiff is conflating the terms "endorsement tag" and

"testimonial tag" is unpersuasive because whereas both sides propose that an "endorsement tag"

is "an active link *including a unique identifier*," Plaintiff proposes that a "testimonial tag" is an

"active link *associated with a testimonial*."

In light of the above-quoted disclosure, as well as the parties' positions as to

"endorsement tag," Plaintiff's proposed construction is appropriate.

The Court therefore hereby construes **"testimonial tag"** to mean **"active link associated

with a testimonial."**

## H.  "set"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| "a collection of one or more" | "at least two" |

(Dkt. No. 253, at 14; Dkt. No. 270, Ex. A, at 1.)  The parties submit that this term appears in

Claims 1 and 5 of the '679 Patent, Claims 2 and 12 of the '055 Patent, and Claims 4, 6, and 8 of

the '646 Patent.  (Dkt. No. 244, Ex. A, at 2.)

<u>(1)  The Parties' Positions</u>

Plaintiff has argued that Defendants' proposal is incorrect because "it is understood that a set may only contain one element."  (Dkt. No. 163, at 24 (citing extrinsic evidence that is quoted below).)  Plaintiff has also submitted that "[i]f the inventors intended what the Defendants argue, the inventors would have instead used the word 'plurality,' which is a commonly used term of art in patent claim draft[ing] when two or more elements are a material part of a claim."  (*Id.*)  Plaintiff has also cited Claim 6 of the '646 Patent, as to which Plaintiff has argued that "comparing, by the intermediary, the set of time stamp data to the set of time restrictions" could refer to "compar[ing] one time stamp to another time stamp."  (*Id.*, at 25.)  Finally, Plaintiff has argued that "[t]he claimed invention still works as described in the specification if there is only one data point in the set" of demographic requirements.  (*Id.*).

Defendants have responded that "[i]n every instance where the patents define a Set, the Set is a plurality of elements."  (Dkt. No. 171, at 15.)  As to Plaintiff's argument that the patentee would have used the term "plurality" if two or more elements were required, Defendants have responded that "[i]t is more plausible that if the patentee intend[ed] Set to conform to Plaintiff's proposed definition, he would have used the term[] 'at least one,' which is also a commonly used term of art in patent claim drafting when one or more elements are a material part of the claim."  (*Id.*, at 16.)  Defendants have noted that the patentee indeed used "at least one" in some of the claims, such as in Claim 1 of United States Patent No. 7,664,516.  (*Id.*)

Plaintiff has replied that Defendants "do not (and cannot) argue that the claimed invention would fail to work if a set only included one element."  (Dkt. No. 175, at 11.)  Plaintiff has also argued that "[t]he patentee uses 'set' to refer to a collection of one or more items (e.g.

set of demographic data, set of geographic coordinates, and set of time restrictions) and uses 'at least one' to refer to selections, choices, and relations from a set."  (*Id.*, at 11.)

In supplemental briefing, Defendants reiterate that "[i]n every instance where the patents define a 'set,' the 'set' is a plurality of elements, such as rules, companies, and applications." (Dkt. No. 253, at 14.)

Plaintiff responds that "Defendants' proposed construction ignores th[e] common understanding of 'set' to improperly and arbitrarily limit its scope to a set containing two or more elements."  (Dkt. No. 264, at 10.)

(2)  Analysis

Defendants have cited the proposition that "[i]n the absence of any evidence to the contrary, we must presume that the use of these different terms in the claims connotes different meanings."  *CAE Screenplates, Inc. v. Heinrich Fiedler GmbH & Co. KG*, 224 F.3d 1308, 1317 (Fed. Cir. 2000).  Claim 1 of the '679 Patent, for example, uses the term "set" as well as the phrase "at least one," and Claim 1 of the '055 Patent (from which two of the claims at issue depend) recites, in relevant part (emphasis added): "a selection of *at least one* endorsement opportunity from the *set* of endorsement opportunities."

As for the specification, the '679 Patent[6] uses the term "set" in plural contexts but does not specify that a "set" necessarily includes at least two members:

> Advertisers 10 also have the ability to identify when and how to apply each advertisement media type based upon a *set* of rules or logic defined by either the advertisers 10 themselves or the intermediary 9.

> *  *  *

---

[6] Defendants have not cited any different or additional disclosures in the other two patents at issue.  (*See* Dkt. No. 171, at 15-17; Dkt. No. 253, at 14-16.)

FIG. 6 is a diagram showing communication between the subscriber, intermediary, and the endorsement companies (advertisers). The *set* of subscribers 600, 610 and 620 possess source devices 602, 612 and 622.

\* \* \*

Subscriber 600 communicates with intermediary 640 through source device 602, network 650 and the intermediary's server 642. Subscriber 600 communicates with any of the *set* of endorsement companies 660 through source device 602, network 650 and *set* of endorsement companies' servers 662.

Intermediary 640 communicates with network 650 through intermediary's server 642. Additionally, list of endorsement companies 644, *set* of subscriber applications 647 and software application for subscriber's devices 648 reside on intermediary's server 642.

'679 Patent at 4:3-6, 6:58-61 & 7:17-27 (emphasis added).

A permissive reading of the term "set" is also bolstered by Plaintiff's extrinsic evidence. Plaintiff has cited a dictionary that defines "set" as "[a] collection of distinct elements that have something in common" (Dkt. No. 163, Ex. 13, *The American Heritage Science Dictionary* 563 (2d ed. 2009); *see id.*, Ex. 14, *Chambers Concise Dictionary* 1124 (2d ed. 2009) (similar)). Plaintiff has also cited extrinsic evidence that the term "set" can be used to refer to a collection that contains only one element (*id.*, Ex. 17, Eric W. Weisstein, "Nonempty set," *MathWorld*--A Wolfram Web Resource, http://mathworld.wolfram.com/NonemptySet.html ("a set containing one or more elements"); *id.*, Ex. 18, Margherita Barile, "Singleton set," *MathWorld*--A Wolfram Web Resource, http://mathworld.wolfram.com/SingletonSet.html ("A set having exactly one element . . . .")).

Finally, at least one legal authority cited by Plaintiff is in general agreement, albeit in the context of a different patent. *See CEATS, Inc. v. Continental Airlines, Inc.*, No. 2012-1614, 526 F. App'x 966 (Fed. Cir. Apr. 26, 2013) (as to a "sets of seats" limitation in patents directed to reserving seats, such as on airplanes or at events, finding that "the jury could reasonably find that

a 'set' could be comprised entirely of a single individual seat").  This authority is more persuasive than the *Mobile Telecommunications* decision cited by Defendants.  *See Mobile Telecomms. Techs., LLC v. Clearwire Corp.*, No. 2:12-CV-308, 2013 WL 3339050, at *4 (E.D. Tex. July 1, 2013) (Payne, J.).

On balance, nothing in the claim language demands that a "set of demographic requirements," for example, must include multiple demographic requirements.  *See, e.g.,* '679 Patent at Claim 1.  Further, construing "set" to mean "a *collection* of one or more," as Plaintiff has proposed, sufficiently distinguishes a "set" from "at least one" so as to avoid or overcome the above-noted *CAE Screenplates* presumption cited by Defendants (to whatever extent that presumption may be applicable).

The Court accordingly hereby construes **"set"** to mean **"a collection of one or more."**

**I. "content communication that can be sent from the qualified subscriber to the recipient" and "content communication between the first source communications device and the first destination communication device"**

| "content communication that can be sent from the qualified subscriber to the recipient" ('679 Patent) | |
| --- | --- |
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| Plain and ordinary meaning | "a single correspondence sent by the subscriber and received by a recipient via their respective communication devices using two-party communications" |

| "content communication between the first source communications device and the first destination communication device" ('055 & '646 Patents) | |
| --- | --- |
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| Plain and ordinary meaning | "a single correspondence sent by the source communication device and received by the first destination communication device using two-party communications" |

(Dkt. No. 253, at 16.)  The parties submit that these terms appear in Claims 1, 3, and 6 of the '679 Patent, Claims 2 and 12 of the '055 Patent, and Claim 4 of the '646 Patent.  (Dkt. No. 244, Ex. A, at 1.)

(1)  The Parties' Positions

Defendants have argued that "the patents relate to inserting advertisements into communication sessions between subscribers and known recipients."  (Dkt. No. 171, at 14.) Defendants have also argued that "[t]hroughout the specifications and even in Plaintiff's opening claim construction brief, the purported invention is described in the context of 'two-way communication systems.'"  (*Id.*).  Further, Defendants have argued, even in the context of pagers "some paging systems offer two-way communication."  (*Id.* (citing *id.*, Ex. D, *Newton's Telecom*

*Dictionary* 691 (23rd ed. 2007)).)  Finally, Defendants have submitted that "[n]one of the

specifications discuss or suggest the insertion of advertisements into social media or blog posts,

articles, tweets, pins or other one-to-many or many-to-many communication formats."  (*Id.*,

at 15.)

Plaintiff has replied that Defendants' proposed construction "[i]mproperly reads in 'two-

way' communication despite explicit 'one-way' embodiments disclosed in the patents such as

pagers."  (Dkt. No. 175, at 14.)

In supplemental briefing, Defendants argue that "in all situations in which the patents

describe processes involving 'content communications,' the patentees expressly contemplate

direct, two-party communications intended for a discrete recipient."  (Dkt. No. 253, at 16.)

Plaintiff responds: "The dispute for this term is a prime example of a Defendant reading

in one embodiment and ignoring others.  The plain language of the terms do not limit the means

of communication to exclude the multitude of indirect communication forms where the

communication involves other parties."  (Dkt. No. 264, at 11.)

<u>(2)  Analysis</u>

Claim 1 of the '679 Patent is representative and recites, in relevant part (emphasis

added):

> 1.  In a system comprising a network, a source communication device, a
> destination communication device and an intermediary connected to the network,
> said intermediary comprising a server adapted to execute a method for providing
> advertising content from at least one advertiser of a group of advertisers to a
> recipient associated with the destination communication device and for
> subsidizing a qualified subscriber associated with the source communication
> device comprising:
> > . . .
> > communicating a subsidy program of the set of subsidy programs to the
> > qualified subscriber;

receiving one or more selections of the at least one advertiser of the group of advertisers and of the chosen subsidy program from the set of subsidy programs;

providing an endorsement tag related to the at least one advertiser of the group of advertisers and linked with the advertising content;

transmitting to the qualified subscriber information for creating a *content communication that can be sent from the qualified subscriber to the recipient*, the content communication including the endorsement tag;

subsidizing the qualified subscriber according to the chosen subsidy program;

receiving a signal through execution of the endorsement tag to transmit the advertising content; and,

transmitting the advertising content to the recipient.

Figure 4 of the '679 Patent depicts a "communication process," and "[i]n step 54, the endorsement manger software 14 formats the transmission by inserting the appropriate advertiser's advertisement preceding and/or following the transmission." '679 Patent at 5:25-28. Then, "[i]n step 58, once the transmission is formatted, the endorsement manager software 14 sends the communication transmission to the communication destination 8." *Id.* at 5:32-34. The '679 Patent also discloses "[o]ther scenarios" where "the destination communication device 7 may insert the advertising media into the communication session." *Id.* at 6:48-57.

The '055 Patent and the '646 Patent also refer to communications occurring in "sessions": "mobile communication devices encourage the recipient of a communication to accept advertisements because the *session* is identified as being initiated by a known contact." '055 Patent at 2:23-25 (emphasis added); '646 Patent at 2:20-22. Also, each of the specifications describes a communication session initiated by a known contact of the recipient. *Id.*; '679 Patent at 6:40-43; '055 Patent at 1:43-47; '646 Patent at 1:40-44. Further, the Background of the Invention begins by referring to "two-way communication systems." '679 Patent at 1:17-18 ("As peer-to-peer and mobile technologies evolve into highly sophisticated two-way communication systems . . . ."); '055 Patent at 1:28-30 (similar); '646 Patent at 1:25-27 (similar).

Nonetheless, Defendants have not adequately justified their proposal of requiring a "single" correspondence or a "two-way" or "two-party" communication session. Instead, these are features of "particular embodiments appearing in the written description [that] will not be used to limit claim language that has broader effect." *Innova/Pure Water*, 381 F.3d at 1117; *accord Phillips*, 415 F.3d at 1323 ("[A]lthough the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments."). In particular, Defendants have not demonstrated that the disputed terms exclude multi-party communications. The Court therefore hereby expressly rejects Defendants' proposed construction.

Defendants' proposal having thus been rejected, no further construction is necessary. *See U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) ("Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement. It is not an obligatory exercise in redundancy."); *see also O2 Micro*, 521 F.3d at 1362 ("[D]istrict courts are not (and should not be) required to construe every limitation present in a patent's asserted claims."); *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1207 (Fed. Cir. 2010) ("Unlike *O2 Micro*, where the court failed to resolve the parties' quarrel, the district court rejected Defendants' construction.").

The Court accordingly hereby construes **"content communication that can be sent from the qualified subscriber to the recipient"** and **"content communication between the first source communications device and the first destination communication device"** to have their **plain meaning**.

**J. "conditioning . . . based on"**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning | "making a choice . . . determined by" |

(Dkt. No. 253, at 19.)  The parties submit that this term appears in Claim 1 of the '679 Patent and Claims 2 and 12 of the '055 Patent.  (Dkt. No. 244, Ex. A, at 1.)

<u>(1)  The Parties' Positions</u>

Defendants have submitted: "[T]he issue perceived by Defendants is that the phrase requires that the choice being made (of subsidy programs, endorsement opportunities, or the advertisement) must be determined by or dependent on the specified item (the match condition or the set of data)," as opposed to being "the same regardless of what is being referred and regardless of how strong of a match, if any, was made between the demographics of the subscriber and the advertiser."  (Dkt. No. 171, at 17.)  Defendants have concluded that "the endorsement opportunities (or subsidies/etc.), for a subscriber must be determined by or are dependent on the matching process between the demographic information from the subscriber and the demographic criteria of the advertiser."  (*Id.*, at 18.)

Plaintiff has replied that Defendants' "identified 'distinction' of how to value a subsidy is not part of this claim term and [is] irrelevant."  (Dkt. No. 175, at 14.)

In supplemental briefing, Defendants reiterate that their proposed construction "seeks to clarify that the claimed system requires the conditioning of a subsidy (*i.e.*, making a choice of subsidy programs) to be based on the match condition (determined by the degree of match between user and advertiser profiles)."  (Dkt. No. 253, at 19.)  Defendants argue that "[t]his requirement of making a choice of subsidy program determined by the match condition appears clear from the claim language itself, but is also explained in the specification . . . ."  (*Id.*, at 20

(citing '055 Patent at 9:58-10:2).)  At the July 8, 2015 hearing, Defendants further emphasized that their proposal of "making a choice" requires a selection from among two or more options.

Plaintiff responds that "it is not clear what clarification is needed since the only time this term is used it requires 'conditioning a set of subsidy programs based on the match condition.'" (Dkt. No. 264, at 14.)  Plaintiff also submits that "Defendants' construction would read out adjusting, preparing, transforming, selecting or any other common understanding for the term 'conditioning.'"  (*Id.*)

(2)  Analysis

Claim 1 of the '679 Patent, for example, recites in relevant part (emphasis added):

1.  In a system comprising a network, a source communication device, a destination communication device and an intermediary connected to the network, said intermediary comprising a server adapted to execute a method for providing advertising content from at least one advertiser of a group of advertisers to a recipient associated with the destination communication device and for subsidizing a qualified subscriber associated with the source communication device comprising:
    obtaining a first profile from the at least one advertiser in the group of advertisers including a set of demographic requirements related to at least one advertiser of a group of advertisers and storing the first profile by the intermediary;
    obtaining a second profile from the source communication device including a set of demographic data related to a subscriber and storing the second profile by the intermediary;
    deriving a match condition between the first profile and the second profile;
    determining if the subscriber is a qualified subscriber based on the match condition;
    *conditioning a set of subsidy programs based on the match condition*;
    communicating a subsidy program of the set of subsidy programs to the qualified subscriber;
    receiving one or more selections of the at least one advertiser of the group of advertisers and of the chosen subsidy program from the set of subsidy programs;
    . . .
    subsidizing the qualified subscriber according to the chosen subsidy program;
    . . . .

Defendants have cited disclosure in the specification of the '055 Patent regarding qualifying subscribers based on demographic criteria:

> At step 161, the intermediary responds to the request by performing a matching process to qualify subscribers for endorsement opportunities.
>
> The matching process correlates the demographic profile data from the subscriber with the demographic criteria of the advertiser. A *correlation value* is assigned by the intermediary. *In the preferred embodiment, the correlation value is calculated by comparing each element of the demographic criteria to each element of the demographic profile to arrive at a correlation value.*
>
> At step 162, the intermediary returns a list of endorsement opportunities for which the subscriber is "qualified."

'055 Patent at 9:58-10:2 (emphasis added). On balance, this disclosure pertains to "particular embodiments appearing in the written description [that] will not be used to limit claim language that has broader effect." *Innova/Pure Water*, 381 F.3d at 1117; *accord Phillips*, 415 F.3d at 1323.

Thus, Defendants have not adequately supported construing "conditioning" so as to depend upon "how strong of a match, if any, was made between the demographics of the subscriber and the advertiser." (Dkt. No. 171, at 17.) Further, as discussed above as to the term "set," Defendants have not adequately demonstrated that there must be two or more options for selection. Defendants' proposed construction is therefore hereby expressly rejected. *See Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1367 (Fed. Cir. 2012) ("The patentee is free to choose a broad term and expect to obtain the full scope of its plain and ordinary meaning unless the patentee explicitly redefines the term or disavows its full scope.").

Nonetheless, some construction is appropriate to clarify that "conditioning" means "selecting." Plaintiff's briefing suggested "selecting" as a meaning of "conditioning" (Dkt. No. 264, at 14) and, at the July 8, 2015 hearing, Defendants had no strong opposition to the word

"selecting," having instead emphasized its above-rejected position that the selecting must be from among two or more options.

The Court accordingly hereby construes **"conditioning . . . based on"** to mean **"selecting . . . based on."**

## V. CONCLUSION

The Court adopts the constructions set forth in this opinion for the disputed terms of the patents-in-suit. The parties are ordered that they may not refer, directly or indirectly, to each other's claim construction positions in the presence of the jury. Likewise, the parties are ordered to refrain from mentioning any portion of this opinion, other than the actual definitions adopted by the Court, in the presence of the jury. Any reference to claim construction proceedings is limited to informing the jury of the definitions adopted by the Court.

Within thirty (30) days of the issuance of this Memorandum Opinion and Order, the parties are hereby ORDERED, in good faith, to mediate this case with the mediator agreed upon by the parties. As a part of such mediation, each party shall appear by counsel and by at least one corporate officer possessing sufficient authority and control to unilaterally make binding decisions for the corporation adequate to address any good faith offer or counteroffer of settlement that might arise during such mediation. Failure to do so shall be deemed by the Court as a failure to mediate in good faith and may subject that party to such sanctions as the Court deems appropriate.

**So ORDERED and SIGNED this 14th day of July, 2015.**


RODNEY GILSTRAP
UNITED STATES DISTRICT JUDGE